IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

    Plaintiff,

v.

KEENAN BLACK,

    Defendant.

Criminal No. 11-00045-0004
**ELECTRONICALLY FILED**

MEMORANDUM ORDER RE: DEFENDANT'S MOTION TO SUPPRESS (DOC. NO. 959)

    Presently before the Court is Defendant Keenan Black's Motion to Suppress. Doc. No. 959. On August 21, 2012, the Government filed an Omnibus Response in Opposition to Defendants' Pre-trial Motions, which addressed Defendant Black's Motion to Suppress. Doc. No. 989, 18-31. This Court held a Suppression Hearing on the Motion on September 18 and 27, 2012. The following witnesses testified: FBI Agent Karen Springmeyer, Pittsburgh Police Detective Thomas Gault, and Defendant Keenan Black. After the hearing, the Government filed a Brief in Opposition to Defendant Black's Motion (Doc. No. 1033) and Defendant filed a Brief in Support thereof (Doc. No. 1034). In light of this Court's Findings of Fact and Conclusions of Law, as set forth below, Defendant's Motion to Suppress will be denied.

## I. Findings of Fact

    1. On January 6, 2011, members of the Federal Bureau of Investigation ("FBI") and Pittsburgh Police officers assigned to a federal task force were listening to live feeds of cell phone communications between Co-Defendant Deron Nixon and others. Cell phone communications were intercepted during the last week of December 2010 and the first week of January 2011 as part of an ongoing investigation. The communications were obtained via a wiretap that had been

authorized as part of an investigation into the Manchester OG's, a violent street gang based in Pittsburgh's Northside neighborhood.

2. Agent Karen Springmeyer was one of the agents that was serving as an "overhearer" (aka listening to a live feed). Pittsburgh Police Detective Amy Mattia was also listening to the communications.

3. During the investigation, agents were in contact with officers to cover locations to verify suspects and to provide physical surveillance.

4. Sometime in the afternoon of January 6, 2011, Agent Springmeyer communicated with Pittsburgh Police Detective Thomas Gault and asked him to obtain the identification of the person who was communicating with Deron Nixon in regards to the drug deal that the overhearers believed had occurred. Previous surveillance indicated to the agents that the person, known to agents as "Son" (aka Sondra), was driving a blue 2003 Dodge Durango.

5. Detective Gault followed the blue 2003 Dodge Durango in question until he observed a moving violation (failure to use turn signal).

6. Detective Gault approached the vehicle and obtained the driver's license, proof of insurance, and vehicle registration. This information indicated that the unknown woman who had been communicating with Co-Defendant Deron Nixon was Co-Defendant Sondra Hunter (aka "Son").

7. Later that same day, Agent Springmeyer and others overhearers heard conversations that led them to believe that a drug deal would be occurring shortly.

8. At approximately 10:00PM, Detective Gault received information from agents listening to the wiretap that, based upon realtime intercepted communications, a drug deal was about to occur on Vinceton Street. Detective Gault was working with his partners Detectives Calvin Kennedy, Jedd Emery, and Mark Adametz. Detective Gault was informed that it involved the same blue 2003 Dodge Durango he had pulled over that afternoon.

9. The Detectives, who were in the same vehicle, traveled to Vinceton Street. The Detectives stopped briefly and then circled the block. Detective Gault observed Co-Defendant Hunter's blue 2003 Dodge Durango which was parked in the 4000 block of Vinceton Street.

10. The Detectives approached the vehicle, Detectives Emery and Gault on the driver's side and Detectives Adametx and Kennedy on the passenger's side.

11. Defendant was wearing black jeans with a belt, a thermal, hooded sweatshirt, and a large ski-style jacket. He was sitting with his jacket zipped up and his legs spread.

12. Detective Emery asked Co-Defendant Hunter for her vehicle information at which point she reached across the car for her glove-compartment. Detective Adametz observed a concealed firearm on Defendant Black's right waistband and signaled to Detective Gault, who proceeded to that side of the vehicle.

13. Defendant Black was uncooperative when asked to exit the vehicle. Detective Kennedy reached to Defendant Black's hip and held the firearm until Defendant Black eventually exited the vehicle.

14. Prior to being searched, Defendant was asked if he had a License to Carry Firearms ("LTCF"), and he answered that he did not have a LTCF.[1]

15. During a search incident to arrest, Detective Gault found $1,320.00 in United States currency, a quantity of marijuana, and 15 bricks of heroin.

16. A police investigative report was completed after the incident by Detectives Adametz and Judd. This report did not mention live wiretap surveillance because Officers feared this information would jeopardize the ongoing investigation.

## II. Conclusions of Law

1. The Fourth Amendment of the United States Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

2. A traffic stop is a "seizure" within the meaning of the Fourth Amendment "even though the purpose of the stop is limited and the resulting detention quite brief." *United States v. Delfin-Colina*, 464 F.3d 392, 396 (3d Cir. 2006) (*quoting Delaware v. Prouse*, 440 U.S. 648, 653 (1979)).

3. It is not a traffic stop, or an encounter that triggers the Fourth Amendment, when "law enforcement officers merely approach an individual in a public place and ask a few questions." *United States v. Drayton*, 536 U.S. 194, 200 (2002).

4. "Law enforcement authorities do not need a warrant to arrest an individual in a public place as long as they have probable cause to believe that person has

---

[1] The Court notes that Defendant Black testified on direct examination that the police did not ask him to make any statements, and he didn't make any comments with respect to the firearm.

3

committed a felony." *United States v. McGlory*, 968 F.2d 309, 342 (3d Cir. 1992) (citing *United States v. Watson*, 423 U.S. 411, 421 (1976)).

5. Under Pennsylvania law, an individual may not carry a firearm in a vehicle without a valid LTCF. 18 Pa.C.S. § 6106(a)

6. The United States Supreme Court has explained that probable cause is a "fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

7. Under *Terry v. Ohio*, 392 U.S. 1 (1968), and subsequent cases, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Valentine*, 232 F.3d 350, 353 (3d Cir. 2000) (*quoting Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).

8. "Reasonable, articulable suspicion" is a "less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence." *Wardlow*, 528 U.S. at 123.

9. The reasonable suspicion of criminal activity may be based upon information gathered from officers other than the officer who conducts the investigatory detention. *United States v. Burton*, 288 F.3d 91, 99 (3d Cir. 2002).

**III. Conclusion**

Defendant contends that: (1) "the approach and stop of the vehicle on January 6, 2011[,] was made without probable cause or reasonable suspicion"; (2) "the questioning of the occupants and the viewing of the occupants of the vehicle was based upon an illegal police stop and no *Miranda* warnings were given by the police"; (3) "the subsequent search of the occupants was performed without probable cause"; and (4) "no search warrant was obtained by the police . . . ." Doc. No. 959, ¶¶ 10-13.

*A. The Approach of the Vehicle Was Justified*

The Court finds that when Pittsburgh Police Detectives approached the parked vehicle, in which Defendant was the front seat passenger, it was an investigative detention. Thus,

Detectives needed reasonable suspicion in order to approach the car. *Wardlow*, 528 U.S. at 123. "To determine whether an officer's suspicion of criminal activity was reasonable, a court must evaluate the totality of the circumstances as they appeared to the officer at the time of the stop." *United States v. Cortez*, 449 U.S. 411, 418 (1981). At the time Detectives approached the vehicle, they had specific, articulable facts that supported their conclusion that Defendant and/or his Co-Defendant Sondra Hunter were violating the law or had just violated the law by completing a drug deal.

This conclusion was supported by contemporaneous surveillance of cell phone communications by federal and local law enforcement officers. These live communications indicated that individuals in the same 2003 blue Dodge Durango that Detective Gault had stopped earlier in the day were about to complete a drug deal. Both Agent Springmeyer and Detective Gault testified as to how live cell phone communications were overhead and then communicated to Detective Gault. Having had the opportunity to observe the witnesses abd their demeanor during their testimony, the Court finds that the testimony was credible and consistent.[2] The belief that a drug deal was about to occur was substantiated when Detective Gault recognized Co-Defendant Hunter's 2003 blue Dodge Durango. Co-Defendant Hunter had become known to Detective Gault earlier that same day as an associate of Co-Defendant Deron Nixon, who had completed a drug deal. *See United States v. Lyon*, 687 F.3d 754, 765 (6th Cir. 2012) (holding that specific information obtained from wiretaps that a female driving a gray vehicle with out-of-state plates would be arriving at a specific location to engage in illegal drug

---

[2] The investigation into drug dealing by the Manchester OG's had been ongoing for almost three years at the time of the incident in question. The intercepted cell phone communications were a key component of that investigation. It was reasonable for the Detectives not to include within their police report that they had received information from those intercepted cell phone communications. The police report was public record and disclosure of that information would have been devastating to the ongoing investigation.

activity, combined with information obtained earlier in the day, constituted reasonable suspicion to conduct a *Terry* Stop); *United States v. Flores*, 571 F.3d 541, 545 (6th Cir. 2009) (holding that information from wiretaps that a drug deal was about to occur at a specific location justified a *Terry* stop of a vehicle at that location); *see also United States v. Ziga*, 2010 WL 3735729 (W.D. La. Aug. 27, 2010), *adopted by* 2010 WL 3747651 (W.D. La. Sept. 16, 2010) (holding that there was probable cause for a traffic stop when intercepted telephone communications indicated a drug deal was going to occur at a specific time and location).

Therefore, when considering all of the facts available to Detectives prior to their approach of Co-Defendant Hunter's vehicle, they had reasonable suspicion to believe that criminal activity had occurred, or was about to occur. As such, the Detectives' approach was consistent with *Terry*. *See Wardlow*, 528 U.S. at 124-25 ("the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior."); *United States v. Abney*, --- F. App'x ---, 2012 WL 3984453, *2 (3d Cir Sept. 12, 2012) ("A court therefore must consider the totality of the circumstances to determine whether there is reasonable suspicion for a *Terry* stop.").

### *B. Detectives Had Probable Cause to Search the Occupants*

When Detectives were alongside the vehicle, Detective Adametz observed a concealed firearm holstered on Defendant Black's waistband. Combined with the information received from the overhearers and Detective Gault's earlier interaction with Co-Defendant Hunter, when Detectives observed a firearm on Defendant Black they had, at a minimum, reasonable suspicion to ask Defendant Black if he possessed a LTCF.[3] *See United States v. Lewis*, 672 F.3d 232, 239 (3d Cir. 2012) (holding that local law regarding the possession of firearms and the totality of the

---

[3] *See* n.1, *supra*.

circumstances are paramount in determining if officers possessed reasonable suspicion) (citations omitted); *see also Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) (An officer is entitled to "ask the detainee a moderate number of questions to . . . try and obtain information confirming or dispelling the officer's suspicions."); *cf. Banks v. Gallagher*, 2011 WL 718632, *6 (M.D. Pa. Feb. 22, 2011) (an "individual's Fourth Amendment's privacy interests in being asked to produce a gun license is much lower [than producing a driver's license]").

This encounter was "the least intrusive means reasonably available to verify or dispel the officer's suspicions in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983). When Defendant responded that he did not possess a valid LTCF, Detectives had probable cause to arrest Defendant for violating 18 Pa.C.S. § 6106(a). Even if, as Defendant testified, he did not speak to Detectives, they ascertained through dispatch that he did not possess a LTCF prior to searching him incident to arrest. They were also able to ascertain that the firearm was stolen. Thus, Detectives had probable cause to arrest Defendant Black independent of statements Defendant may have made.

### *C. Miranda Warnings Were Not Necessary Prior to Arrest*

Defendant Black was not in custody at that point and, therefore, no *Miranda* warnings were required. *Berkemer*, 468 U.S. at 440; *United States v. Velasquez*, 885 F.2d 1076, 1082 (3d Cir. 1989). Furthermore, if, as Defendant Black contends, he did not make any statements to the Detectives during the encounter then there are no statements to be suppressed.

### *D. No Search Warrant Was Necessary*

As discussed above, Detectives had probable cause for Defendant Black's arrest. When arresting Defendant Black, Detectives had the inherent right to conduct a search incident to arrest. *Chimel v. California*, 395 U.S. 752, 762-63 (1969). A search incident to arrest always

7

includes the ability to search a defendant "in order to remove any weapons [the arrestee] might seek to use and in order to prevent [the] concealment or destruction of evidence." *Arizona v. Gant*, 556 U.S. 332, 339 (2009) (internal quotation marks and citation omitted). Defendant's only argument is that the evidence seized from his person should be suppressed. There was no need for Detectives to seek a search warrant because evidence was obtained incident to arrest and as such, the evidence was lawfully obtained.

**IV. Order**

AND NOW, this 9th day of October, 2012, IT IS HEREBY ORDERED that Defendant's Motion to Suppress (Doc. No. 959) is **DENIED**.

s/ Arthur J. Schwab  
Arthur J. Schwab  
United States District Judge

cc: All Registered ECF Counsel and Parties